DAVID W. RIZK - CABN # 284376
2261 Market Street, Suite 5947
San Francisco, CA 94114
Telephone:   (415) 517-9044
Email:        david@dwr-firm.com

Counsel for Defendant GARLOCK

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM GARLOCK,<br><br>Defendant. | **Case No.:** CR 21-097 CRB<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE** |

1

2

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................4

II.  BACKGROUND .............................................................................................9

   A.  Personal History……………………………………………………………….9

   B.  Legal Proceedings Since 2018……………………………………………….10

III.  PRESENTENCE REPORT & GUIDELINES CALCULATION...................13

   A.  Large portions of the PSR are copied and pasted from the government's letters to the Probation Officer, not the result of an independent investigation……..………………15

   B.  The loss amount and adjustments for Mr. Garlock advocated by the government in the PSR cannot be reconciled with those for Ms. Rodriguez, either on the facts or under the law……………………………………………………………………………16

IV.  ARGUMENT.................................................................................................22

V.  CONCLUSION ..............................................................................................28

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

**CASES**

*Gall v. United States*, 552 U.S. 38 (2007) .................................................................. 21

*Kimbrough v. United States*, 552 U.S. 85 (2007) ...................................................... 21

*Nelson v. Arizona*, 555 U.S. 350 (2009) .................................................................... 21

*Rita v. United States*, 551 U.S. 338 (2007) ............................................................... 22

*Russell v. Rolfs*, 893 F.2d 1033 (9th Cir. 1990) ....................................................... 13

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ............................................. 21

*United States v. Fine*, 975 F.2d 596 (9th Cir.1992) ................................................. 17

*United States v. Harrington*, 947 F.2d 956 (D.C. Cir. 1991) ............................ 4, 16, 19, 20

*United States v. Sharritt*, Case No. 06-40041, 2009 WL 3247128 (D. Mass. Oct. 7, 2009) (Saylor, J.) 20

*United States v. Wong*, 2 F.3d 927 (9th Cir. 1993) .................................................. 16

**STATUES**

18 U.S.C. § 1956 ............................................................................................. 13, 20

18 U.S.C. § 3553 ............................................................................................ 7, 21, 22

**OTHER AUTHORITIES**

U.S.S.G. § 1B1.3 .......................................................................................... 16, 17, 21

U.S.S.G. § 2B1.1 ..................................................................................... 13, 16, 18, 19

U.S.S.G. § 2S1.1 .......................................................................................... 13, 20

U.S.S.G. § 3C1.3 ............................................................................................. 14

U.S.S.G. § 3E1.1 .......................................................................................... 14, 21

U.S.S.G. § 4A1.1 ............................................................................................ 14

U.S.S.G. § 4A1.2 ............................................................................................ 14

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT'S SENTENCING MEMORANDUM
*GARLOCK*, CR 21–097 CRB

Assistant U.S. Attorneys ("AUSAs") have been heard to say, with open candor, that there are many "games to be played," both in charging defendants and in plea bargaining, to circumvent the Guidelines. Because of this reality, sentences under the Guidelines often bear no relationship to what the Sentencing Commission may have envisioned as appropriate in any given case.

*United States v. Harrington*, 947 F.2d 956, 964 (D.C. Cir. 1991) (Edwards, J., concurring).

***

## I.   INTRODUCTION

Defendant William Garlock will be before the Court for sentencing after the Court granted him permission to plead no contest because he is bordering on incompetent at age 74[1] due to a yearslong history of documented neuropsychological impairment. The government has been on notice since 2019 that it was prosecuting a man in his seventies in decline, and it now seeks to send that incapacitated, elderly defendant to prison for what is likely to be the rest of his life.

The history of the government's prosecution of this case is unusually protracted. Beginning in 2010, the FBI and the U.S. Attorney's Office initiated their investigation of Mr. Garlock. Mr. Garlock was a self-made real estate developer who, after a successful 30-year career, lost his business in the 2009 real estate collapse of the Great Recession. He was forced into involuntary bankruptcy in 2012 by real estate investors, and those legal proceedings lasted roughly three years until 2015. More years passed before the government finally decided to charge Mr. Garlock in 2018 for omitting assets (a house and a horse) from submissions to the bankruptcy trustee while unrepresented by counsel (his attorney effectively abandoned the representation before the filings, and then was disbarred for extensive misconduct across many cases). *See* Case No. 18-cr-418 VC. In the resulting criminal case brought against Mr. Garlock, when he attempted to plead guilty and stumbled during the plea colloquy, Judge Chhabria ordered him evaluated, which revealed the onset of his cognitive impairments. He was found competent nevertheless and was permitted to accept responsibility at the time. The government requested a 30-month sentence, but Judge Chhabria sentenced him instead to a year and a day. That was back in 2019. Perhaps dissatisfied with the Court's sentence, and before Mr. Garlock had even surrendered to serve it, the prosecution promptly (*i.e.*, within a few months)

---

[1] The PSR incorrectly lists his age as 73 years old, but lists his date of birth correctly.

instituted this case. First, the government filed charges against Mr. Garlock's longtime business associate Gina Rodriguez as the sole defendant in connection with the 2017 scheme that is at issue here, and then almost nine months later, the government charged Mr. Garlock as her co-defendant. Because Mr. Garlock and his wife were utterly broke, his prior retained counsel passed on the second case, and he was appointed undersigned counsel.

Not long after he was charged, in the summer of 2021 Mr. Garlock reported to serve his prison term at FCI Lompoc at age 71 and in a state of cognitive decline. He was unable to review discovery that the government continued to produce while he was in Bureau of Prisons (BOP) because the prison would not allow him a tablet. His ability to take care of himself in the prison was limited by his frailty as well as his mental condition: then as now, he forgets matters large and small constantly, suffers disorientation, and struggles to complete some basic tasks as an adult. At Lompoc, Mr. Garlock was physically assaulted by his cellmate (reportedly a gang member). While Mr. Garlock was in BOP custody, his wife, a former schoolteacher who is fighting cancer and now invalid, suffered a series of strokes. Mr. Garlock is currently her primary and only caregiver; Mr. Garlock's son works fulltime and has three children and is unable to take care of her in her increasingly poor condition. Since Mr. Garlock was released from prison, he has been on supervised release working fulltime on the streets of the Tenderloin for Urban Alchemy (despite his age) because no other employment is available to him. To date, he has had no problems whatsoever on supervised release.

The Court permitted Mr. Garlock to enter a plea of no contest because, as a practical matter, he was simply unable to endure a trial or complete a plea colloquy with a complicated and lengthy factual basis. The no contest plea obviated the need to inquire into the factual basis. After Mr. Garlock plead no contest, Your Honor requested an updated neuropsychological evaluation; it is attached, and it confirms that Mr. Garlock's deficits remain a problem for him in daily life and continue to limit his ability to participate meaningfully in the judicial process. *See* Rizk Decl. Ex. A (Jan. 18, 2024 Neuropsych. Eval.) (under seal) & Ex. B (Feb. 4, 2019 Neuropsych. Eval.) (under seal). Thankfully, his condition does not appear to have deteriorated further, however, according to the neuropsychologist, the findings of the most recent June 2022 examination "remain wholly applicable to Mr. Garlock's current level of functioning" at the present time:

1
2
3
4

[Mr. Garlock] is also losing track of some historical details and he tends to perseverate more with details including being forgetful about names and particular events. He tends to repeat the same stories in line with his tendency to perseverate particularly when he has problems with accuracy in his recall. This can involve difficulty remembering company names and exactly what transpired. All of this is in line with what he displays on a neurocognitive basis.…

*Id.* at 21-22.

5
6
7
8
9
10
11
12
13
14
15
16

For a relatively modest loss amount and an elderly and impaired defendant, this is an odd case for the government to have spent so much time and money investigating. Nevertheless, the government pursued both Mr. Garlock and Ms. Rodriguez very aggressively for years. At first, both parties declined plea agreements offered by the government that were very similar. While Ms. Rodriguez prepared for trial, defense counsel for Mr. Garlock instead arranged to have him evaluated by a neuropsychologist, who found that the defendant could not meaningfully proceed except with highly burdensome accommodations to the Court's trial. Mr. Garlock changed his plea first, over the government's objections. Notably, the government reversed its initial position and ultimately insisted that he enter a no-contest plea to every single count, rather than a subset. Ms. Rodriguez, by contrast, set a trial date and continued to expend the government's resources in litigation. Presumably, she prepared to blame her elderly and impaired co-defendant at trial until the government, apparently realizing the risks of proceeding, suddenly changed its tune and cut her a lenient, no-time deal.

17
18
19
20
21
22
23
24
25
26
27
28

The government's sentencing positions for these two co-defendants are litigation-driven, not rooted in the actual facts or the law. To the victims' detriment, there are major inconsistencies in the Guideline calculations, loss, and restitution amounts advocated by the government for Mr. Garlock and Ms. Rodriguez, even though it has been the government's position all along that Ms. Rodriguez is fully culpable for all the criminal conduct. That is exactly what government counsel urged to the grand jury, and even now, of course, were the Court to press, the government could not truthfully deny that it stands by all of its allegations against her and was prepared to prove them. It was only midway through the presentence investigation process in Mr. Garlock's case that the government suddenly reversed course, and took the position that Ms. Rodriguez should be treated much more leniently once she relieved them of a trial. The government now claims that the total offense level, the loss amount, and restitution to victims, should be far lower for Ms. Rodriguez, not because the facts support that position, but because the government permitted Ms. Rodriguez to plead to just two

counts related to the 2019 scheme.[2] The government's position thus runs contrary to basic principles of relevant conduct under the Guidelines and the law, and ultimately, is simply an artifice of the prosecution's own making, as it negotiated the terms of Ms. Rodriguez's plea agreement.

To be clear, Mr. Garlock does not believe that Ms. Rodriguez' plea agreement yields an unjust result. Instead, the defense's view is that her non-custodial sentence represents a fair estimation of the value of this case, and sheds light on what an appropriate sentence and downward variance for Mr. Garlock should be, given the similarities in their respective positions before the Court. Mr. Garlock urges the Court to accept Ms. Rodriguez's plea agreement, adopt the parties' Guidelines calculation, credit the government's non-custodial recommendation for Ms. Rodriguez as appropriate, and then apply the same approach to this case to determine an appropriate sentence for Mr. Garlock in view of the need to "avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6). As set forth in greater detail, if the Court disregards the games played by the government with the Guidelines and instead adopts the government's own approach to the Guidelines, as exemplified by Ms. Rodriguez's plea agreement, then Mr. Garlock's recommended sentence should be 33-41 months, not the absurd range of 87-108 months advocated by the prosecution in the PSR. The Court should thus vary from the Guidelines substantially and impose a brief custodial sentence for Mr. Garlock, as set forth below. Notably, the government's own proposed variance for Mr. Garlock based on his age and infirmity, of 44 months, does not account for any of the games it has played with the Guidelines. If the government's variance were applied in conjunction with a fair estimation of the Guidelines in view of Ms. Rodriguez's case, however, it would result in a non-custodial sentence for Mr. Garlock.

Notably, there are points of comparison between the two co-defendants beyond their equal responsibility for the charged offenses. The fact that Ms. Rodriguez suffered significant trauma much earlier in life is certainly a good reason to show her lenience. Mr. Garlock, for his part, encountered

---

[2] Although Ms. Rodriguez plainly has far greater assets than Mr. Garlock, notably the government failed to seek full restitution from her for each of her victims (namely, Robert Gould and Elizabeth Tessman), and instead seeks restitution only from her for a minority of the loss, while yoking Mr. Garlock, who is judgment proof, *with* all of the restitution debt to the victims. In practice, this means that two of the victims are unlikely to get paid thanks to the government. It has offered no credible justification for this arrangement, but the greater financial punishment sought for Mr. Garlock should be taken into account by the Court.

adversity more recently, at the end of his life. Like Ms. Rodriguez, he worked hard throughout his life. He was raised modestly in a middle-class family and excelled in school. His success in business over a thirty-year career was the result of hard work. After the 2009 crash, he was financially ruined and lost his way in bankruptcy. The prior prison sentence understandably took a major toll on him, and he is now elderly and infirm. He has spent the last years of his life working on the street in the Tenderloin pursuant and caring for his dying wife. *See* Rizk Decl., Ex. C (March 11, 2024 Ltr. fr. J. Garlock).

Thus, while he certainly originally brought business acumen and sophistication when he and Ms. Rodriguez first started working together, by the end, she was regarded at least by witnesses and her victims, such as Michael Kirsch, as a "successful business woman" in her own right and a "partner" to Mr. Garlock. She ran the operations of their venture, undertook almost all the communications with investors including the misrepresentations, controlled the relevant corporate entities, and consummated all the transactions. Ms. Rodriguez was not an unsophisticated assistant. Now it is her good fortune that she is still enjoying her middle age, in good health, and apparently has enough personal wealth—reportedly from ongoing real estate dealings—not only enough to pay off two sets of retained lawyers in this case, but also $400,000 in restitution *in full* at the time of sentencing.

Given Mr. Garlock's age, his neuropsychological deficits, his indigence, his wife's poor health, and the fact that he has been effectively incapacitated and relegated to the sidewalks of the Tenderloin for the last two years, he asks for a custodial sentence of 14 days in custody, followed by three years of supervised release. At some point, the Court must consider the virtue of repose. The government has now been pursuing Mr. Garlock for almost fifteen years and he is 74 years old. It is now asking for a multiyear sentence for conduct that occurred five to eight years ago, before he received a yearlong prison sentence from Judge Chhabria in his seventies. To serve the purposes of the sentencing statute, the Court need not condemn Mr. Garlock to a prison sentence for so many months or years. Sending an elderly man to jail sends a message. Such a sentence, however, will be survivable for Mr. Garlock and permit him to continue to care for his wife.

## II.    BACKGROUND

### A.    Personal History

As set forth in the PSR, Mr. Garlock enjoyed a middle-class upbringing in the Midwest. PSR ¶ 63. As a child he lived in Columbus, Ohio and Chicago, Illinois, before eventually moving to Southern California in 1962. *Id.* ¶ 63. His father worked in manufacturing and his mother was a homemaker, who raised Mr. Garlock and his two younger brothers, Jimmy and Greg. *Id.* ¶ 64. Both of his parents reportedly drank too much. *Id.* ¶ 65.

Mr. Garlock attended Catholic schools through high school in Chicago and later Southern California. He graduated from Pomona Catholic in Claremont, California. *Id.* ¶ 80. There, he demonstrated a propensity for mathematics and consistently earned exceptional grades. Outside of class, Mr. Garlock played football and ultimately was named team captain. He earned a scholarship to U.C. Riverside to play football, but following a serious concussion accident, he left to work and eventually finished college at U.C. Santa Barbara in 1971, where he was drawn to the study of economics. *Id.* ¶ 66. Throughout college, Mr. Garlock worked Security Pacific to support himself. In Santa Barbara, Mr. Garlock also met his future wife, Rosie, and they married after several years. They moved to the peninsula in, and he enrolled in business school, eventually earning an M.B.A. from Stanford in 1975, while Rosie took a job as an assistant to a professor. *Id.* ¶ 80.

Around this time, Mr. Garlock's younger brother Jimmy began displaying signs of serious mental illness and he turned to drugs and alcohol. He never sought or was provided with mental health treatment, and remained reliant on the family for financial and personal support. Mrs. Garlock worked as a substitute teacher. According to Mr. Garlock, his wife struggled with severe anxiety for the majority of their marriage. When her father died in 1989, her physical and mental health declined significantly, and she stopped communicating with her family. Eventually, with the help of therapy and medication, she was able to recuperate.

After graduating from business school, for nearly forty years, Mr. Garlock worked in real estate development and investment at a variety of California-based firms, including the Irvine Company, DOAN in San Francisco, and several ventures of his own, including Garlock and Company. *Id.* ¶ 80; *see also* Case No. 18-cr-418 VC, Dkt. No. 32 at 3-4. During its peak years, his company financed and

developed numerous properties throughout California, Oregon, and Arizona. As a result of his hard work, Mr. Garlock enjoyed success and wealth in the 1990s and early 2000s.

That ended when the real estate bubble burst in 2009, triggering the Great Recession. Like many other businessmen in real estate during that era, Mr. Garlock went bankrupt. The banks that had financed his company's real estate projects called his loans, and he could not meet his financial obligations. He was sued by creditors and forced into involuntary bankruptcy in 2012. After suffering an adverse ruling compelling the production of documents, in 2013 Mr. Garlock's counsel appears to have effectively abandoned the representation, claiming that he was "unavailable" due to a family medical emergency. *See* Case No. 18-cr-418 VC, Dkt. No. 32 (Def. Sent. Memo) at 5-6. Shortly thereafter, Mr. Garlock made the ordered financial disclosures directly counsel for the bankruptcy court, and in doing so omitted various assets, which, years later, eventually led to the criminal charges. *Id.* Roughly two months after abandoning Mr. Garlock, his counsel—who had no particular expertise and was utterly unqualified to appear in bankruptcy court—was served with disciplinary charges by the California State Bar for fifty separate counts of professional misconduct, including defrauding roughly a dozen other clients. He did not formally withdraw from the bankruptcy proceedings, however, until late 2014, roughly three months before he was disbarred. *Id.* at 6.

After the bankruptcy proceedings was discharged in 2015, the bankruptcy trustee's former counsel former her own law office to join and prosecute ongoing adversary proceedings against Mr. Garlock. *Id.* Even after the bankruptcy was discharged, adversary proceedings (led by the bankruptcy trustee's former counsel) against Mr. Garlock continued until 2017. Mr. Garlock was ultimately successful in defending against all but two claims, and at the end of those proceedings in July 2017, the U.S. Attorney's Office re-instituted its investigation into Mr. Garlock, eventually resulting in the 2018 criminal case.

### B. Legal Proceedings Since 2018.

When Mr. Garlock attempted to enter a change of plea almost five years ago in the 2018 case, Judge Chhabria halted the change-of-plea proceedings because it was apparent that Mr. Garlock was relying too heavily on his counsel to answer the Court's questions during the plea colloquy. *See* Case No. 18-cr-418 VC, Dkt. No. 27 (Aug. 29, 2019 Minute Entry) ("The plea colloquy began, but was

stopped because the Court witnessed Mr. Garlock's reliance on his counsel when asked whether he waives the rights the Court was examining him about."). Defense counsel in that hearing mentioned, in response to the Judge Chhabria's concerns about Mr. Garlock's behavior, that Mr. Garlock suffered from early-stage dementia. Dkt. No. 80 ¶ 3. The disclosure prompted Judge Chhabria to request the first neuropsychological evaluation of Mr. Garlock, and also to continue sentencing to order U.S. Probation to investigate Mr. Garlock's dementia further. *See* Case No. 18-cr-418 VC, Dkt. No. 34 (Dec. 17, 2019 Minute Entry) ("The Court ordered Probation to investigate the assertions that Mr. Garlock has stage 1 dementia..."). The neuropsychologist found that he may be displaying initial stages of a dementing process, and recommended he be seen again in a year and a half to two years, which ultimately prompted undersigned defense counsel to follow up.

Mr. Garlock's surrender date was continued several times due to the COVID-19 pandemic until July of 2021. He related to U.S. Probation as well as the examining neuropsychologist that he was attacked by his cellmate, a Mexican gang member, at FCI Lompoc. PSR ¶ 77; Rizk Decl. Ex. A at 5. His condition in prison appeared to worsen. As he related to the examiner, Mr. Garlock related that "he read the same book at least three times while in prison before it gradually dawned on him that he had read this book." Rizk Decl., Ex. A at 6. Defense counsel and staff from the federal public defender's office certainly observed the difference in Mr. Garlock's condition before and after he served his sentence at Lompoc. The most recent neuropsychological exam reveals that Mr. Garlock and his wife appear to be struggling to take care of normal responsibilities, such as writing and balancing their checkbook. *See* Rizk Decl., Ex. A at 6 (wife bounced check and is unable to reliably pay rent since her stroke, requiring Mr. Garlock to take the task over), 19 (in simulated test with examiner, Mr. Garlock failed to sign checks and then miscalculated the remaining balance).

Around the same time as Mr. Garlock was prosecuted in the bankruptcy case, his wife was diagnosed with lung cancer. She underwent radiation therapy and suffered side effects. PSR ¶ 71. In the bankruptcy case, the prosecution argued that no consideration should be given to Mr. Garlock's wife's condition at sentencing. *See* Case No. 18-cr-418 VC, Dkt. No. 35 (government sentencing memo arguing, "the defendant's wife is not in such a condition that incarcerating her husband would work an unreasonable hardship on her or their son"). In fact, while Mr. Garlock was in custody, his

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

wife suffered a series of strokes and is now unable to perform daily activities. As U.S. Probation

relates: "The defendant spends much of his free time tending to his wife's needs as they do not have

an in-home care provider." PSR ¶ 71. To U.S. Probation, Mr. Garlock's son Jason

> expressed a lot of anger and frustration over his father's current legal situation. If the defendant gets incarcerated again, he advised it will have an immense impact on him financially. Previously, he took a lot of time off while his father was incarcerated due to his mother's stroke and helping to take care of her. Since he is their only child there is no one else to help his mother while his father is away. He noted he has a wife and three children of his own he must provide for. Therefore, he asks for leniency from the Court as he believes the defendant has learned his lesson by now.

*See* PSR ¶ 73.

Mr. Garlock received his year-and-a-day sentence from Judge Chhabria in February 2020. Just

five months later, the government had already filed its Complaint in this case against Ms. Rodriguez,

*see* Dkt. No. 1 (dated July 29, 2020), and later before he went to prison, it filed the original

Indictment naming Mr. Garlock, see Dkt. No. 22 (dated March 9, 2021). As set forth in prior filings,

defense counsel sought to negotiate a plea agreement with the government but was thwarted by Mr.

Garlock's inability to recall events, find words, perseverate, digress, and confuse information. Dkt.

No. 77 (sealed Motion to Enter No Contest Plea). In view of these difficulties, undersigned defense

counsel wrote to the government to request specifically that it forebear from filing a superseding

indictment given that:

> … I have now had my client evaluated by a neuropsych and confirmed that he has progressive dementia and impairment in his ability to retain information over even short delays, among other issues. For example, he often can't even recall my name. I'm considering whether to send him to a neurologist and/or file a motion.

Dkt No. 80, Ex. A (unredacted). The defense's efforts to persuade the government that there was a

problem with Mr. Garlock went unheeded. Defense counsel wrote again to the government:

> Given that Garlock has progressive dementia and is significantly impaired in some respects, I would ask that you forebear from obtaining a superseding indictment until my investigation into his mental capacity is competed. I think Garlock is still considering your offer but I do think – like Judge Chhabria – it makes sense to evaluate his capacity before agreeing to sign him up for a plea. I understand you may not be willing to agree, but I think I would be remiss if I didn't ask you for that.

*Id.* (unredacted). The government nevertheless decided to bring additional charges—and then

protested strenuously when the defense requested that Mr. Garlock be permitted to enter a no contest

plea, as a result of his mental infirmities. At the time the government decided to bring additional

charges in 2022, Mr. Garlock's cognitive problems were described by the examiner as follows:

> He would not be able to necessarily verify accuracy of other testimony since he would not reliably recall the information himself. An additional problem for a trial situation is he could not testify reliably. He has significant difficulty with word finding and verbal production and also has difficulty with concept formation. He can readily become confused, disorganized, and perseverative. It would be doubtful that he could manage cross examination with providing accurate information, and the challenge of trying to do this would contribute to further display of cognitive difficulty. A result would be that rather than accurate testimony, there would simply be display of his impairment.

Dkt. No. 77, Ex. B at 7 (under seal). The fact was (and is), Mr. Garlock could not reasonably complete a normal plea colloquy. The Court therefore rightfully permitted him to enter a no contest plea. *See* Dkt. No. 84.

## III.   PRESENTENCE REPORT & GUIDELINES CALCULATION

The Court should adopt a uniform approach to the Guidelines for both defendants, or at least adopt a variance to avoid an unwarranted disparity between the two defendants, given that the scope of their relevant conduct is exactly the same. *See, e.g., Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990) (the court possesses discretion to "bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one.").

The majority of the enhancements in Mr. Garlock's PSR, and hence the disparity, are purely the result of the government's gamesmanship:

    (1)    The loss amount under U.S.S.G. § 2B1.1(b)(1) should not be calculated two levels higher for Mr. Garlock than Ms. Rodriguez because the relevant conduct is identical, the loss is the same, the government is seeking more restitution from Mr. Garlock;

    (2)    Mr. Garlock should not receive a further two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(a)(iii), for causing "significant financial hardship" while Ms. Rodriguez does not, given again that their relevant conduct is the same and that they are equally responsible for causing harm to the exact same set of victims (Ms. Tessman, the Kirsches, and Mr. Gould);

    (3)    Mr. Garlock should not receive yet another two-level enhancement under U.S.S.G. § 2S1.1(b)(2)(B) for pleading no-contest to a violation of 18 U.S.C. § 1956, given that the

scope of the two pleas was of the government's own making, and has nothing to do with the actual facts or their true culpability; and,

(4)    Finally, Mr. Garlock should not be denied acceptance of responsibility under U.S.S.G. § 3E1.1 given that, unlike Ms. Rodriguez he did not seek a trial, he plead no contest to all Counts whereas she plead to just two Counts, continues to deny relevant conduct, and is avoiding full restitution, and ultimately, because the Court recognized that he did not have the mental capacity to proceed in another way.

Applying these adjustments fairly across the defendants, or at least applying a variance in Mr. Garlock's case to eliminate any disparity, his adjusted Total Offense Level (TOL) should be 19, not 28.[3] Notably, the PSR also makes a basic mistake in calculating Mr. Garlock's criminal history score, wrongly ascribing three points to his prior sentence of twelve months and a day, rather than two. *See* PSR § 56; U.S.S.G. §§ 4A1.1(a)(1) ("Add 3 points for each prior sentence of imprisonment exceeding one year and one month."), 4A1.2(a)(2) ("[I]f prior sentences are treated as a single sentence, use the longest sentence of imprisonment if concurrent sentences were imposed."). Nevertheless, applying his Criminal History Category II to TOL 19, a fair estimation of the Guidelines range, consistent with Ms. Rodriguez's calculation, is 33-41 months. It is worth noting that, even applying the 44-month downward variance recommended by the government for Mr. Garlock, which contemplated his personal circumstances but not the inequities in the Guidelines that are of the government's own making, a noncustodial sentence would be the result.

### A.    Large portions of the PSR are copied and pasted from the government's letters to the Probation Officer, not the result of an independent investigation.

In an indication of how much U.S. Probation is merely a mouthpiece for the government's positions, much of the draft and final PSR was copied and pasted word-for-word from the government's various letters to probation. The defense objected to some of these copied-and-pasted passages because they are simply the government's own regurgitated legal assertions, as well as

---

[3] In contrast to the government's gamesmanship, the defense candidly concedes that an enhancement under U.S.S.G. § 3C1.3 applies to Mr. Garlock because the 2019 offenses he committed with Ms. Rodriguez occurred while he was on pretrial supervision.

conclusory factual statements. An example is:

> Evidence showed that Garlock acted with the intent to deceive the Kirsches, and that he thus acted with the intent to defraud, because, at the time that the $400,000 loan was solicited and obtained from the Kirsches, Garlock knew that he and Rodriguez would not comply with the representations that had been made to the Kirsches about the uses to which the loan funds would be put.

PSR ¶ 30. Notably, although the probation officer now characterizes this as "factual," the government's own letter to probation from which this passage was directly copied and pasted, cited no evidence or relevant facts whatsoever for support. *See* Rizk Decl., Ex. D (Apr. 10, 2023 Ltr. to USPO) at 9. In fact, the government's letter includes the exact same boilerplate assertions about both the 2019 and the 2017 scheme. *Id.* at 6.

In response to the defense objection to the PSR, perhaps unsurprisingly, the probation officer, simply copied and pasted more language from the government's subsequent letters to the probation officer as its "response." *See* Rizk Decl., Ex. E (July 3, 2023 Ltr. to USPO) at 2 (verbatim in PSR). The government/probation's argument is that Mr. Garlock's *mens rea* may be inferred from the fact that Ms. Rodriguez quickly withdrew the Kirsch's funds from an escrow account into a company that she controlled, and ironically, the government argues that the defense should be barred from raising any objection to the PSR based on an estoppel theory because Mr. Garlock plead no contest. *Id.* There is no cited authority for that contention, and it does not make any sense on its face given that a plea of *nolo contendere* does not require the defendant to stipulate to any specific factual basis.

The purpose of pointing this matter out, of course, is not to retry a charge to which Mr. Garlock already conceded, as the government seems to think; the defense does not intend to maintain the objection such as to require a ruling. Instead, the purpose is to highlight for the Court that the PSR does not reflect an independent investigation or determination by U.S. Probation in this case. Instead, as set forth below, the probation officer simply adopted the government's legal and factual positions, even where they were wrong and inconsistent with the probation officer's own determination.

**B.    The loss amount and adjustments for Mr. Garlock advocated by the government in the PSR cannot be reconciled with those for Ms. Rodriguez, either on the facts or under the law.**

The defense objects to the Guidelines calculation in the PSR because it is legally and factually irreconcilable with U.S. Probation and the government's position in Ms. Rodriguez's case. There is

no meritorious justification for the government's transparent effort to manipulate the Guidelines as it has done in this case; instead, it is all litigation-driven. As this Court knows well, and as Judge Harry Edwards has acknowledged decades ago, there are "many games to be played" with the Guidelines. *Harrington*, 947 F.2d at 964. Although *Harrington* was handed down prior to *Booker*, of course, the games that the government continues to play with the Guidelines in service of its sentencing recommendations, remain a source of inequity in our judicial system. As the Judge Edwards presciently explained:

> [One] disparity-creating game to be played—this one by prosecutors and defense attorneys in collaboration—is the plea bargaining process. By offering a plea, defense counsel may be able to cut a deal with a prosecutor to "bend the rules." However, whether the rules actually get bent may depend upon the luck of the draw in judicial assignment: if the trial judge is willing to look the other way, the facts can be manipulated and the Guidelines ignored because no appeal will be taken by the prosecutor. *See* [JUDICIAL CONFERENCE OF THE UNITED STATES, REPORT OF THE FEDERAL COURTS STUDY COMMITTEE, 135-140 (1990)] at 138 ("some prosecutors (and some defense counsel) have evaded and manipulated the guidelines in order to induce the pleas necessary to keep the system afloat") ….

> Assistant U.S. Attorneys are under a general policy mandate not to drop readily provable criminal counts against a defendant. *See* U.S. Department of Justice, Prosecutors Handbook on the Sentencing Guidelines 46-47 (1987). But it is well-understood that AUSAs can and do drop counts … if dropping the count is necessary to induce a plea. In addition (or as an alternative) to dropping counts, the AUSA also may vary the subsidiary facts asserted in a given case, thereby changing the sentence. Under the Guidelines, the quantity of drugs involved in a drug offense, *see* U.S.S.G. § 2D1.1, and the amount of money involved in theft and fraud-related offenses, *see id.* § 2B1.1, control the base offense level for sentencing. AUSAs, often in plea bargains, can affect sentencing by "adjusting" the amounts of drugs and money claimed to be involved in a criminal charge.

*Harrington*, 947 F.2d at 965 (Edwards, J., concurring). Here, the government is of course playing games with the loss amount and other adjustments. The purported justification for the legal fiction that Ms. Rodriguez' scope of liability under the Guidelines is more limited than Mr. Garlock's is that he plead no contest to all of the charges, whereas Ms. Rodriguez only admitted to some of them, *see, e.g.,* Dkt. No. 101 (Gov't Sent. Memo) at 5. This is no basis at all.

To state the obvious, relevant conduct does not turn on the scope of a defendant's criminal liability. U.S.S.G. § 1B1.3 (Relevant Conduct), App. Note 1; *and see United States v. Wong*, 2 F.3d 927, 929 (9th Cir. 1993) ("[T]he relevant conduct provisions allow the sentencing judge to take into account groupable offenses which were charged but to which the defendant has not pleaded guilty.")

1   (citing *United States v. Fine*, 975 F.2d 596 (9th Cir.1992) (en banc)). One need look no further than

2   the description of the offense conduct in Mr. Garlock's PSR itself, which was copied and pasted from

3   the government's factual submissions to U.S. Probation, to see that there is no colorable argument

4   that the scope of relevant conduct is different for these two co-defendants. *See* U.S.S.G. § 1B1.3(2)

5   (defining as relevant conduct "all acts and omissions described in subdivisions (1)(A) and (1)(B)

6   above that were part of the same course of conduct or common scheme or plan as the offense of

7   conviction"); *see also id.*, App. Note 5(b)(i) ("For two or more offenses to constitute part of a

8   common scheme or plan, they must be substantially connected to each other by at least one common

9   factor, such as common victims, common accomplices, common purpose, or similar modus

10  operandi.").

11          These two schemes involve the same two defendants doing continuous business for years

12  together in the same line of business (real estate development); working hand-in-hand—even using a

13  shared email address—to solicit investors using a common investment firm (Menlo Capital), and then

14  making improper transfers to a shell company (West Edge Halo and 2555 Pulgas EPA, LLC, *e.g.*)

15  closely held by the two co-defendants. In both the 2017 and 2019 schemes, Ms. Rodriguez held

16  signatory power over the corporate entity involved and Mr. Garlock exercised some degree of control

17  over the actions taken by the defendants. As per the government's own submissions to U.S. Probation

18  in Mr. Garlock's case,[4] these two schemes contained significant similarities: in 2017, the defendants

19  needed money "for the 24th Street Property and to pay for other business debts and expenses and for

20  their own personal expenses." *See* Rizk Decl., Ex. D (Apr. 10, 2023 Ltr. to USPO) at 8. In 2019,

21  "[b]oth 24th St. and 29th St. were in default," and the defendants together sought a loan secured by

22  the two properties, the proceeds of which were used in part to pay off the outstanding debt on those

23  two properties. *See id*. In both schemes, Mr. Garlock and Ms. Rodriguez then solicited funds from

24  _____

25  [4] Rather than providing equal transparency, the government limited its PSR-related disclosures of

26  discovery to U.S. Probation in Ms. Rodriguez's case, as compared to Mr. Garlock's case. For her
    case, government counsel removed approximately 100 documents from the materials that were

27  disclosed in Mr. Garlock's case, withholding primarily information primarily that showcased Ms.
    Rodriguez' involvement in criminal conduct dating to 2017, which the government now claims is

28  irrelevant to her Guideline calculation.

investors and in the process made statements regarding the purported use of the sought funds: relating to the 2019 scheme, "that the loan funds would be used to 'develop' the 24th Street property," and relating to the 2017 scheme, "Capital/67th Street obtained through investments pursuant to the PPM would be invested with the 67th Street LLC…." The co-defendants' practice was then to move the money obtained from investors into other entities they controlled. Notably, the 2017 machinations were ongoing until 2020. *See, e.g.,* PSR ¶ 38 (related to last payment received by a victim of the 2017 scheme in October 2020). In other words, Mr. Garlock and Ms. Rodriguez worked together on both schemes during the same time period.

Accordingly, there is no basis to hold that the scope of relevant conduct, or any Guidelines adjustments that flow therefrom, should vary between the two co-defendants. Obviously, that is fundamentally true for the loss amount under § 2B1.1(b)(1). If the Court is inclined to accept the premise, set forth in Ms. Rodriguez's plea agreement, that she is only responsible for a loss of more than $250,000 but not more than $550,000, the same should be true for Mr. Garlock. It is worth pausing to appreciate the strangeness of the government's position: in its quest to punish Mr. Garlock severely and let Ms. Rodriguez off lightly, it forsakes the interests of their victims, Ms. Tessman and Mr. Gould. As to Mr. Gould, the government did not appear to support him as a victim, given that he claimed to have suffered an undocumented loss of $300,00, comprised of $270,000 that was "paid to a financial consultant" and "$30,000 in legal fees." Rizk Decl., Ex. F (June 30, 2023 Ltr. to USPO) at 2. After Ms. Rodriguez reached an agreement to avoid paying her restitution debt to Mr. Gould, however, the government changed its tune in an apparent effort to maximize Mr. Garlock's debt, claiming to the probation officer, "it is arguable that [Mr. Gould] is a victim of this fraud and has suffered a loss of $260,000 by virtue of his reimbursement payments to Murphy, Austin, and the Triolos.[5]" *Id.* As Judge Edwards explained three decades ago, playing games with the loss amount is no way to effectuate justice, even if it remains prevalent in today's federal criminal practice.

---

[5] If the Court is inclined to order that Mr. Gould is a victim because he compensated some investors, first he should be ordered to provide a declaration that his losses were not otherwise indemnified or insured, to protect against any windfall. Discovery in the case indicates he misled Ms. Tessman and FBI agents in an effort to avoid or delay telling them about the frauds being perpetrated within his investment firm, Menlo Capital, raising serious questions about his credibility.

*Harrington*, 947 F.2d at 965. At a minimum, the Court should consider varying downward for Mr. Garlock to correct for the disparity created by the government in its attempt to manipulate the loss amount.

The same is true for the "substantial financial hardship" enhancement under U.S.S.G. § 2B1.1(b)(2)(a)(iii) that the PSR applies to Mr. Garlock's case, but not to Ms. Rodriguez's case, thanks again to the government's games. In Mr. Garlock's case, of course, the government advocated to apply the enhancement, and the PSR includes it. Rizk Decl., Ex. D (Apr. 10, 2023 Ltr. to USPO) at 11; PSR ¶ 45 ("As noted in the letters from Ms. Tessmann, Mr. Kirch [sic], and Mr. Gould, the instant offense caused significant financial hardships, a combined loss of $960,000. Since the offense resulted in substantial financial hardship to one or more victims, a two-level enhancement is warranted. U.S.S.G. § 2B1.1(b)(2)(a)(iii)."). However, when it comes to Ms. Rodriguez's case, the government's position is the opposite. Indeed, as it turns out, U.S. Probation actually found in Ms. Rodriguez's draft PSR that the enhancement *should* apply to her case because of the $400,000 loss suffered by the Kirsches. Dutifully, on behalf of Ms. Rodriguez and in service of her plea agreement, the government strenuously objected with multiple paragraphs of argument, starting out:

> The government submits that there is insufficient evidence to conclude that the victims at issue in the counts of conviction (*i.e.,* the Kirsches) suffered substantial financial hardship as a result of the offense of conviction. Although Mr. Kirsch has stated that he "lost a substantial portion" of his retirement account, the Guidelines commentary states that that is only one factor to be considered in determining whether a victim has suffered "substantial financial hardship" under Section 2B1.1(b)(2)(A). *See* Amend. 792 ("[T]he amendment adds a non-exhaustive list of factors for courts to consider in determining whether the offense caused substantial financial hardship.") (emphases added). The government has no information that the Kirsches became insolvent, filed for bankruptcy, lost money in any other accounts, made substantial changes to their lifestyle or living arrangements, or suffered harm to their ability to obtain credit. *See* U.S.S.G. § 2B1.1, comment n.4 (F).

Rizk Decl., Ex. G (July 11, 2023 Ltr. to USPO) (under seal) at 11. Even putting aside the greater point that the other victims should have been considered under basic principles of relevant conduct, the notion that a victim's loss of a substantial portion of their retirement, constituting nearly half a million dollars, does not constitute "substantial financial hardship," is the height of absurdity,

1   especially coming from the government.[6] Rather than apply its own independent judgment, the

2   probation officer blindly agreed and eliminated the enhancement from Ms. Rodriguez's final PSR.

3   As for Mr. Garlock, on the other hand, U.S. Probation finalized its conclusion that the Kirsches

4   suffered "substantial financial hardship," *see* PSR ¶ 45, and the government strategically kept quiet

5   about the obvious disparity.

6       The final two objectionable adjustments are the result of the government's games in the PSR

7   not with the facts, but with the form of the co-defendants' pleas. The scope of the co-defendants'

8   liability under Guidelines is entirely of the government's own making. Mr. Garlock entered a no

9   contest plea to all charges because a trial or normal plea colloquy with an extensive factual basis was

10  virtually impossible, as the Court recognized at that time in accepting the plea. Initially, Mr. Garlock

11  offered initially to plead to a subset of Counts, and the government agreed, before reversing itself and

12  insisting that he plead to all Counts—which he did, graciously, to minimize further disputes. Dkt. No.

13  84. His plea thus covered Counts 4 and 5, violations of 18 U.S.C. § 1956, triggering a two-level

14  enhancement under U.S.S.G. § 2S1.1(b)(2)(B). The government's agreement that Ms. Rodriguez

15  could avoid pleading to Counts 4 and 5, and instead plead to Counts 6 and 7, has nothing to do with

16  her culpability or actual conduct, of course. As Judge Edwards assayed in *Harrington*, the scope of

17  her plea agreement is merely a strategic agreement to "bend the rules" to obtain a plea by promising a

18  non-custodial sentence. At a minimum, the Court should consider this obvious disparity as an

19  appropriate basis for a further variance. *See* 947 F.2d at 965.

20      Finally, as to acceptance of responsibility under § 3E1.1, while the defense acknowledges that a

21  plea of no contest does not necessarily entitle Mr. Garlock to such credit, his plea was submitted and

22  accepted by the Court for legitimate reasons that were not of his own making. *See, e.g., United States*

23  *v. Sharritt*, Case No. 06-40041, 2009 WL 3247128 at *1-2 (D. Mass. Oct. 7, 2009) (Saylor, J.)

24  (permitting defendant to plead no contest in order to avoid the ordeal of trial because "(1) defendant

25  has mental health issues, (2) there is at least some evidence of memory loss, and (3) there is also

26  evidence suggesting that defendant's mental health issues may be exacerbated by the trial."). The

27  _____

28  [6] It is also no answer to say that Ms. Rodriguez is wealthy enough to pay off the debt; that is not the
    government's position, and finds has no support in the law or the Guidelines.

DEFENDANT'S SENTENCING MEMORANDUM
*GARLOCK*, CR 21–097 CRB

government's efforts to have Mr. Garlock punished more severely because his cognitive impairments prevented him from pleading guilty or otherwise meaningfully participating in these proceedings is unjust and short-sighted. It is also not supported by the pragmatic considerations that in part underlie the Guidelines adjustment, namely, "permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1(b).

Mr. Garlock's plea was entered on March 24, 2023. Dkt. No. 84. By contrast, Ms. Rodriguez continued to deny the allegations and instead immediately stipulated to set a trial date and pretrial deadlines that were originally to begin on June 8, 2023. Dkt. No. 86. On June 13, 2023, she reversed course and requested a hearing to change her plea according to the terms under discussion. With her plea agreement, Ms. Rodriguez acknowledges less culpability than Mr. Garlock, avoids $560,000 in restitution she should otherwise owe to the victims, and refraining from admitting the full scope of her relevant conduct for purposes of the Guidelines. Technically speaking, even "falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)," may be grounds for withholding acceptance of responsibility. *See* U.S.S.G. § 3E1.1(b), App. Note 1(A). Of course, Mr. Garlock is doing no such thing. For its part, the government does not even attempt to address these glaring disparities that it puts before the Court.

In sum, the reality here is that the Guidelines are entirely driven by the government's machinations in litigation, not tethered to the law, the facts, or the relatively culpability of the two defendants before the Court. The Court should credit the plea agreement between Ms. Rodriguez and the government, accept its approach to the Guidelines calculation, and vary downward for Mr. Garlock for all of the reasons set forth above.

## IV.   ARGUMENT

Courts have an overarching obligation to impose sentences that are sufficient but not greater than necessary to achieve the goals of 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Although they provide a starting point and should be respectfully considered, the Guidelines are not mandatory and should not be accorded more weight than the other section 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Importantly, not only are the guidelines not mandatory, "they are also

not to be presumed reasonable." *Nelson v. Arizona*, 555 U.S. 350, 352 (2009) (emphasis added); *see also Rita v. United States*, 551 U.S. 338, 350-51 (2007). Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Several matters warrant the Court's consideration in connection with the § 3553(a) factors and Mr. Garlock's request for a sentence of 14 days custody and three years of supervised release:

*First*, as to the circumstances of the offense and Mr. Garlock's personal history, neither suggests a much longer custodial sentence must be imposed. With regard to the circumstances of the offense, once again, the non-custodial sentence requested by the government for Ms. Rodriguez speaks volumes about the fair value of this case. She is responsible for the same wrongdoing as Mr. Garlock and yet she is being spared a $560,000 debt thanks to the government's lenience. The government's various efforts to portray Ms. Rodriguez as a mere accomplice to Mr. Garlock fall flat. Obviously, the government has not sought any minor or mitigating role adjustment for her simply because the facts do not support it. She was an equal operator, and the sad reality is that Mr. Garlock relied on Ms. Rodriguez heavily to commit the 2019 fraud. Indeed, at that exact time, a neuropsychologist found serious, documented deficiencies in his cognitive abilities that were sufficient to give Judge Chhabria pause as to whether Mr. Garlock could even participate in a plea colloquy. Rizk Decl., Ex. B (Feb. 4, 2019 Neuropsych. Eval.). No witness described her participation as secondary to Mr. Garlock, and in fact, the government had to labor before the grand jury to avoid suggesting that Mr. Garlock's role was in fact secondary to Ms. Rodriguez's role. To the extent the government alternatively wants to argue that Ms. Rodriguez should only be punished for the 2019

scheme, and not the 2017 fraud, that suggestion does not comport with the factual record in this case. Ms. Rodriguez was equally involved in the 2017 scheme, and she has been Mr. Garlock's business partner and completely involved in ventures with him for years.

The loss amount in this case, however it is ultimately measured, is also relatively low for a federal case—under a million dollars. Reference to comparable fraud cases, cited below, that involved losses in the multimillions to hundreds of millions of dollars, warranted custodial sentences far less than the 44 months sought by the government here. It is true that Mr. Garlock was prosecuted previously for the bankruptcy fraud case and was on pretrial supervision when he and Ms. Rodriguez solicited the Kirsches for investment.[7] On the other hand, Mr. Garlock was amply punished for the bankruptcy fraud with a sentence of a year and a day at FCI Lompoc as a septuagenarian, followed by three years of supervised release. And, although Ms. Rodriguez also knew about Mr. Garlock's ongoing criminal case back in 2019, she elected to assist in committing the offenses that she has now admitted without any apparent compunction. Indeed, the government is recommending far-below Guideline sentences for both defendants despite the fact that the 2019 scheme occurred while Mr. Garlock was on pretrial supervision.

With respect to his personal circumstances, Mr. Garlock's cognitive health is in decline and there cannot be any serious question that he would be particularly vulnerable in a prison environment. *See generally* Rizk Decl., Ex. A. Simply put, he is unable to defend himself because of his age and frailty. Driving home that reality, Mr. Garlock was assaulted during his prior sentence at Lompoc, and on April 10, 2024, he was attacked again on the streets of the Tenderloin while working in his capacity as an Urban Alchemy ambassador. *See* Rizk Decl., Ex. H (Apr. 16, 2024 Criminal Protective Order) (under seal).[8] Mr. Garlock was at a location where Urban Alchemy employees take their breaks, and a man who appeared to be on drugs demanded Mr. Garlock give him money. When Mr. Garlock declined, the man punched him in the face, leaving him with a concussion and injuries to his

---

[7] The government asserts that Mr. Garlock has committed various other uncharged frauds in its sentencing memorandum, while omitting to mention that during the pendency of this case it has also accused Ms. Rodriguez of being involved in other frauds that did not lead to charges. Unfortunately, that point does not really distinguish Mr. Garlock from his business partner Ms. Rodriguez.
[8] Mr. Garlock requested a copy of the incident report, but has not received it from S.F.P.D.

DEFENDANT'S SENTENCING MEMORANDUM
*GARLOCK*, CR 21–097 CRB

face and eyes. He went to the hospital and was placed on leave from his employment for two weeks. *See* Rizk Decl., Ex. I (Apr. 24, 2024 Workman's Comp. Med. Note) (under seal). Returning Mr. Garlock to Lompoc to join the ranks of federal inmates who can no longer take care of themselves or even remember why they are imprisoned is likely to be a life sentence for him.[9]

    *Second,* just punishment, deterrence, and public safety, do not warrant a custodial sentence. As an initial matter, Mr. Garlock no longer presents any threat to public safety whatsoever. It has been *five years* since he participated in the 2019 scheme with Ms. Rodriguez. In those five years, he has abided by BOP's regulations, and complied fully with all of the conditions of his supervised release since 2021. Indeed, he will soon be successfully released from his post-conviction supervision in the 2018 case. Not only has Mr. Garlock complied with his conditions, he has devoted himself to serving the needs of the community in the most humbling way: the elderly real estate broker who once owned a successful business spent the last three years on the sidewalks in the Tenderloin, subsisting on Social Security, and taking care of his invalid wife. Effectively, Mr. Garlock has already been incapacitated by his prior sentence and his ongoing supervision, the end of his relationship with his former business partner Ms. Rodriguez (on whom he relied for virtually all operations), and his flagging memory and cognitive function.

    With respect to just punishment, again, sending an elderly man to jail even for a relatively brief period (14 days) and $900,000 in restitution, sends a highly punitive message—especially when the middle-aged, richer, female co-defendant walks away with a probationary sentence and less restitution debt. The bottom line is, if the government believes that a noncustodial sentence is just punishment for Ms. Rodriguez given the scope of the co-defendants' joint criminal conduct, it cannot possibly justify a multiyear custodial sentence for Mr. Garlock. Mr. Garlock has already been amply punished by the government's long-running investigation of him. He is now in his mid-seventies and the government first took up his case nearly fifteen years ago, when he was still in his fifties. The neuropsychologist relates that the government's prosecution of Mr. Garlock has isolated him socially

---

[9] *See* Katie Engelhart, *N.Y. Times*, Opinion Guest Essay, "I've Reported on Dementia for Years, and One Image of a Prisoner Keeps Haunting Me," Aug. 11, 2023, *available at* https://www.nytimes.com/2023/08/11/opinion/dementia-prisons.html (last accessed May 3, 2024).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and, not surprisingly, had a severe negative impact his mental health:

> I suggested that being as socially isolated as he sounded to be was a definite health risk for him, so it would behoove him to reach out to friends and spend time engaged in activities with them, along with his wife, to the best of her ability. Again, Mr. Garlock said this was not possible since he lost all of his friends and social relationships, and he is generally viewed as a pariah in his old social circles, with no one being willing to speak with him.

Rizk Decl., Ex. A at 20. Mr. Garlock's son Jason has also written to the Court to emphasize the impact the government's serial prosecutions of his father have had on the defendant and his family. Rizk Decl., Ex. C. The defense strongly urges the Court to consider the impact that the prior sentence and term of supervision has already had on Mr. Garlock before sending him back to prison.

As to specific deterrence, the government fails to confront or even fairly acknowledge the fact that it is now asking for a multiyear sentence to deter and to punish conduct that occurred five to eight years ago, *before* Mr. Garlock received a yearlong prison sentence from Judge Chhabria. In other words, the government fails entirely to consider the deterrent impact that the prior sentence had on Mr. Garlock. The fact is, since that sentence was imposed and served, Mr. Garlock has been entirely law-abiding and compliant. The government's sentencing recommendation is thus uninformed by the criminological concepts of recency and salience. The deterrent and punitive effects of imposing a sentence for previously occurring conduct are profoundly undermined when the defendant has, in the meantime, *already* been subject to an intervention in the form of a custodial sentence. Ultimately, the government's puzzling decision to pursue an elderly defendant overlooks the reality that Mr. Garlock has already been subject to punishment, ample deterrence, and ultimately incapacitation. Regarding general deterrence, the most recent evidence from the Sentencing Commission shows that there is no deterrent effect from federal sentences imposed that are less than 60 months; a longer or shorter sentence under that threshold has no statistical impact on the likelihood of recidivism.[10] Accordingly, there is no empirical basis to believe that the sentence urged by the government in this case will have any impact on general deterrence, even in the white collar

---

[10] U.S. Sentencing Commission, *Length of Incarceration and Recidivism*, June 2022 at 4 ("For federal offenders sentenced to 60 months or less incarceration, the Commission did not find any statistically significant differences in recidivism."), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf (last accessed Aug. 23, 2023).

realm. The government's argument to the contrary is not supported by any cited empirical evidence, or even a case from within this Circuit.

*Third*, as to educational, vocational, medical, or other correctional treatment, a longer custodial sentence will not provide Mr. Garlock with any benefits. To the contrary, a prison sentence is likely to be seriously deleterious to his health and offer no benefits to Mr. Garlock. It will prevent him from caring for his wife, a circumstance for which the government has no meaningful solution. Notably, incarcerating Mr. Garlock for as long as the government recommends would also likely cost taxpayers at least $180,000 (assuming he needs average medical care, which is unlikely), further compounding the overall cost to the community of resolving this matter. PSR ¶ 99 (detailing estimated costs of confinement). Although the government never seems to account for the societal costs of overincarceration, Mr. Garlock respectfully urges the Court to do so when evaluating the real need for a custodial sentence of any length.

*Fourth*, and finally, a multiyear custodial sentence would also create unwarranted sentencing disparities, contrary to § 3553(a)(6), especially in comparison with other "white collar" sentences meted out previously by this Court. A few examples:

- *United States v. Howatt*, Case No. 15-cr-101 CRB: the loss amount was $3.9 million and although the defendant suffered from some mental health conditions, he was under the care of a psychiatrist and was not unwell at the time of the thefts; he spent the money to purchase real estate, artwork, motorcycles, and a boat; he was able to repay the majority of the loss amount because he and his family had substantial assets; the Court sentenced him to twelve months and a day.

- *United States v. Reyes*, Case No. 06-cr-0556 CRB: the total value of the fraud estimated by the government's expert was over $900 million; obviously, the defendant was highly sophisticated and not influenced by any addiction; the Court sentenced the defendant to 18 months of custody.

- *United States v. Bhikha*, Case No. 19-cr-0115 CRB: the defendant was ordered to pay $1.15 restitution to his employer Cisco Systems and $2.5 million of concealed tax debts to the IRS, in a highly sophisticated kickback scheme that the government contended resulted in far greater

loss amounts; the defendant suffered from adversity during his earlier life, but also attended college and enjoyed significant wealth; when confronted by his employer, he doubled down on the elaborate fraud rather than confess his wrongdoing; the Court granted the defense's request and sentenced the defendant to 36 months of custody.

All of these cases are considerably more aggravated and involved frauds or thefts of far greater value. Although no case comparison is "apples to apples," all of these prior sentences, when compared to Mr. Garlock's case, support the imposition of a relatively brief jail sentence.

## V.   CONCLUSION

For all the reasons set forth above, Mr. Garlock respectfully asks the Court to sentence him a sentence of 14 days in jail, followed by three years of supervised release.

Dated:      May 3, 2024                                Respectfully submitted,

                                                            _____/S_____
                                                            DAVID W. RIZK
                                                            Counsel to Mr. Garlock